Filed 8/16/16  In re Bryan Z. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re BRYAN Z., et al., Persons Coming Under the Juvenile Court Law. | B267433 |
| | (Los Angeles County Super. Ct. No. DK11837) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  DANIEL Z.,  Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Marguerite Downing, Judge.  Affirmed.

Lisa A. Raneri, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Assistant County Counsel, and Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant Daniel Z. ("Father") appeals from the juvenile court's jurisdiction finding and disposition order declaring his two minor children, Bryan and Eduardo, dependents of the court pursuant to Welfare and Institutions Code[1] section 300, subdivision (b). Father argues the evidence was insufficient to support the jurisdictional finding that his drug and alcohol use placed the children at a substantial risk of serious physical harm. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Section 300 Petition

Father and Patricia M. ("Mother") are the parents of Bryan (born August 1998) and Eduardo (born October 2002). They also have two adult sons, Jose and Irvin. The family came to the attention of the Department of Children and Family Services (DCFS) on February 25, 2015, based on a referral alleging neglect of the children. According to the caller, Mother had abandoned the children over a year ago and Father came to live with them a short time later. After a few months, Father did not pay the rent and the family was evicted from their home. The family had been living in its current home for the past three months, but was being evicted again based on Father's failure to pay the rent. The caller alleged that Father was addicted to drugs and alcohol, supplied drugs and alcohol to Bryan, and did not regularly feed the children because he exchanged the family's food stamps for beer. The caller also alleged that the children were having issues in school, and that the family's home was kept in a filthy condition.

On February 26, 2015, the DCFS made an unannounced visit to the home. The social workers first met with the children's 18-year-old sibling, Jose, who disclosed that he and his siblings had been living with Father for less than a year. They previously lived with Mother, but she abandoned the family and was no longer in contact with them. Jose explained that Father had not paid the rent on the family's current home for the past three months, and as a result, they were being evicted. Jose currently was attending an adult

---

[1] All further statutory references are to the Welfare and Institutions Code.

education school, but was considering dropping out so that he could work to help pay the rent. The children's other adult sibling, Irvin, was disabled due to a seizure disorder and dependent on the family for his care. Jose reported that Father regularly drank alcohol, but he doubted that Father exchanged food stamps for beer. Although Jose had not seen Father use drugs, he believed Father was a drug user and wanted the DCFS to have Father take a drug test. Jose also stated that Father was an aggressive person, but denied that he was physically abusive. Jose felt that his brothers were safe in the family's home because he helped care for them and was protective of them.

The social workers separately interviewed 12-year-old Eduardo and 16-year-old Bryan. Both children were clean and dressed appropriately with no signs of physical abuse. They similarly expressed that they felt safe in the home and always had food to eat. They reported that they had a good relationship with Father, but had not kept in contact with Mother since she left them. The children stated that Father occasionally drank alcohol, but denied that he ever got drunk, used drugs, or exchanged food stamps for beer. While Bryan admitted that he smoked marijuana given to him by his friends, he denied that Father supplied him with drugs. The children also denied any physical abuse in the home or problems in school. Eduardo explained that Jose usually took care of him and his brothers and ensured there was enough food in the home.

The social workers also interviewed Father about the referral. According to Father, the children had been living with Mother in a housing project until she abandoned them in March 2014. Father then moved into the home to care for the children, but they were evicted after a period of time because only Mother's name was on the housing paperwork. The family had been served with an eviction notice for its current home because Father did not have steady employment as a construction worker, and at times, was unable to pay the rent. Father intended to use the money that he received from his income tax refund toward the overdue rent. Father stated that he typically drank three beers a day, but denied he had an alcohol problem or traded the family's food stamps for beer. He also denied using drugs or supplying any drugs to Bryan. Father indicated that he got along well with the children and believed they were safe in his care.

3

During a visual inspection of the family's home, the social workers observed that the home was cluttered and disorderly, but posed no safety threats to the children. The kitchen was stocked with adequate food, and the utilities were in working condition. No alcohol, drugs, or drug paraphernalia were observed. Father assured the social workers that he would clean the home and would ask the children to assist with the cleaning. Father also stated that he was willing to submit to on-demand drug and alcohol testing and to participate in a case plan if necessary.

On February 27, 2015, Father tested positive for amphetamine, methamphetamine, cannabinoids, and alcohol. After being informed of the results, Father admitted that he had used drugs 10 days earlier with his coworkers, but denied that he was a habitual drug user. At a team meeting held on March 23, 2015, Father agreed to participate in a voluntary family maintenance plan and to complete random drug testing, an outpatient drug program, and individual and family counseling. Father again tested positive for amphetamine, methamphetamine, and cannabinoids on April 1, 2015, and failed to appear for drug tests on March 23, April 16, April 30, May 1, and May 8, 2015. During a follow-up interview with the DCFS, Father stated that he was not doing anything wrong, such as selling drugs from his home, and that he planned to enroll in a drug treatment program shortly. He also maintained that he was feeding his children and making sure they were attending school. When asked about the possibility of the children staying with their uncle in another state, Father answered that there was nothing for them to do there and he wanted to discuss the matter with them first.

On May 18, 2015, the DCFS made another visit to the family's home, which had been cleaned. Father stated that he did not want Bryan and Eduardo removed from his care because there were no drugs in the home and he felt the children were safe. The social worker expressed concern that Father had tested positive for drugs and then failed to submit to further testing or enroll in a drug treatment program. Father responded that he could not take time off from work for any drug tests or programs, and questioned whether the DCFS would pay his bills if he missed work. Father also stated that he would continue to test positive for drugs because all of his coworkers were drug users

4

and he needed to use drugs to do his construction job. During the visit, the social worker met with Bryan and Eduardo, who again denied any knowledge that Father was abusing drugs or alcohol. Both children reported that they were currently attending school, although Eduardo had been expelled from his previous school for misbehavior. The social worker also spoke with the adult sibling, Jose, who inquired whether Father could move out of the home and Jose could assume custody of the children given that he was already caring for them. Father initially indicated that he was agreeable to such a plan. However, in a subsequent conversation with the social worker, Father stated that he was not willing to move because it was difficult to find other housing. Father also noted that there currently was no gas in the home because he needed to put his name on the gas bill. In response to the social worker's concerns about his drug use, Father reiterated that he believed the children were doing fine in his care.

On May 26, 2015, a specialized foster care therapist visited the family's home to assess whether Bryan and Edwardo were in need of mental health services. The therapist observed that Father was defensive at first and appeared to be "coming down from a high." After conducting her assessment, the therapist had a number of concerns about the family and particularly about Eduardo, who appeared to be angry. She did not perceive any direct or immediate threat to the children's safety; however, she recommended that both Bryan and Eduardo be provided with mental health services.

On May 29, 2015, the DCFS received a second referral regarding Father. The caller reported that, during a recent visit to the family's home, Father was acting in an agitated and bizarre manner. All of the furniture in the home had been pushed to the side of the room and the dishes were piled in the sink. The caller stated that both Jose and Bryan had confirmed that Father was still using crystal methamphetamine and that he would clean the home throughout the night. The caller also reported that Bryan appeared to be depressed and that Jose was working two jobs to support the family.

On June 3, 2015, the DCFS held another meeting with the family. Father again agreed to participate in random drug testing and a drug treatment program. Both Bryan and Eduardo expressed that they wanted Father to enter a drug rehabilitation program

5

while they remained in the family's home. The children also reported that Jose had been taking care of them by paying the rent and purchasing food for the family whenever necessary. The following week, Father enrolled in an outpatient drug treatment program, which included weekly drug testing and individual and group therapy.

On June 19, 2015, the DCFS filed a section 300 petition on behalf of Bryan and Eduardo under subdivision (b) of the statute. The petition alleged that Father had a history of substance abuse and was a current user of methamphetamine, amphetamine, marijuana, and alcohol, including at times when the children were under his supervision and care. It further alleged that Father's substance abuse rendered him incapable of providing regular care for the children, endangered their health and safety, and placed them at risk of serious physical harm. On July 27, 2016, the DCFS filed a first amended section 300 petition, which added an allegation that Mother had left the children without making a plan for their ongoing supervision and care. At the arraignment hearing, the juvenile court found that there was prima facie evidence that the children were persons described by section 300, and ordered that they remain released to Father pending a jurisdiction hearing. The court also ordered the DCFS to provide Father with family maintenance services and to demonstrate due diligence in attempting to locate Mother, whose whereabouts remained unknown.

## II.    Jurisdiction/Disposition Report

For its July 29, 2015 jurisdiction/disposition report, the DCFS conducted further interviews with Father and the children. When the dependency investigator arrived at the family's home for the interviews, Father was agitated and angry. He told the investigator that he wanted Jose to move out of the home. He also repeatedly yelled at Jose, who was in another room. The investigator was unable to calm Father down. Father accused Jose of stealing $300 from him, and indicated that the police had been called to the home the previous night because Jose had challenged him to a fight. Although Father had wanted the officers to remove Jose from the home at that time, they had not taken any action. In

6

addition to complaining about Jose, Father accused Mother of stealing money and insisted that Mother's family was manipulating the children to act out.

With respect to the allegations in the petition, Father admitted that he had tested positive for drugs and had a history of drug use. Father initially stated that he used drugs "only . . . sometimes." When asked to describe the frequency of his drug use, however, Father answered, "Well like I would use like on Monday and then like on Wednesday and that was it." Father related that drugs helped him to continue working as well as to relax. He denied using drugs inside the home and indicated that he only used drugs supplied by his coworkers while he was at work. Father also asserted that he was not a drug addict because he used drugs "for work purposes only." When questioned about his alcohol use, Father showed the dependency investigator a 40-ounce can of beer that was defrosting in the sink. He stated that he drank about two to three beers a day, had consumed one that morning, and planned to consume another a short time later. He further claimed that he drank alcohol because it was the only thing that helped alleviate his dry mouth. Although Father had enrolled in a drug treatment program, he reported that he was not comfortable with the program because he felt the counselor judged him. Father told the investigator, "All I want is to be understood and treated with respect." He also stated, "I am not just going to sit back and let someone mistreat me." Father was currently unemployed and expressed to the investigator that all he needed was for the DCFS to "get off his back" so that he could work and provide for his children.

In his interview with the dependency investigator, Bryan indicated that he had never seen Father use drugs, but he believed Father had a drug problem in the past. He also stated that Father drank alcohol from time to time, but was never violent. When asked if he felt safe with Father, Bryan answered, "Yes, my dad just gets angry and then says dumb shit." Bryan reported that Father and Jose often argued, and that Father had falsely accused Jose of taking $300 from him, even though Father previously had agreed that the family could set aside that money for rent. Bryan noted, "My dad just feels that he is right all the time, but he is not." Bryan was aware that Father had not been paying the rent and the family was being evicted from their home. Although Bryan was willing

7

to live with relatives if necessary, he wished to remain with Father and believed Father would not harm him or his brothers. At the time of the interview, Bryan was not currently enrolled in school and his teenage girlfriend was pregnant.

In his interview, Eduardo maintained that he had never seen Father use drugs. According to Eduardo, Father used to drink alcohol more often prior to the DCFS's involvement, but he currently drank alcohol only "once in a while." Eduardo was aware that Father and Jose often argued over issues such as money, but denied that it affected him. Eduardo explained that, after Mother abandoned the family, Jose and Bryan took care of him until Father moved into the home. The child added, "We always take care of ourselves and my brother, Irving too." Eduardo expressed that he wished to continue living with Father and did not want "to go anywhere else."

The dependency investigator also interviewed Jose who expressed concern about the well-being of the children in Father's care. As described by Jose, Father had not paid attention to Bryan's schooling and allowed Eduardo to do whatever he wanted. Father also relied on Jose to pay the rent owed on the family's home. Jose would set aside $300 from the money that Father received in government assistance for the monthly rent, and then would pay the remaining $500 owed for the rent from his own wages. When Jose became sick and was unable to work for a period of time, Father did not take any action to pay the rent; the family was again facing eviction. Jose was willing to assume custody of Bryan and Eduardo because he was already taking care of all of their needs. Jose did not think that Father posed an immediate risk to his brothers, but he did not want Father to remain in the home "to keep acting like a fool."

After interviewing the family, the dependency investigator spoke with the case manager at Father's drug treatment program. The case manager reported that Father had been discharged from the program because he continued to test positive for drugs and failed to attend the required group and individual sessions. Although Father was given an opportunity to remain in the program if he signed a contract regarding his participation, he did not show up for his scheduled appointment to address the matter. Prior to his

8

discharge, Father tested positive for methamphetamine and marijuana on June 18, June 22, and July 2, 2015, and failed to appear for a test on July 7, 2015.

On August 25, 2015, the DCFS submitted a supplemental report to the juvenile court. According to the report, the social worker and dependency investigator met with Father on August 19, 2015 to discuss his continued drug use, the children's safety in the home, and family's financial situation. Father maintained that he was not dependent on drugs and that he only used methamphetamine occasionally for work purposes. He also continued to insist that his alcohol use was solely to treat a dry mouth. Father did not believe his drug and alcohol use placed his children at any risk, and he was adamant that the children remain in his care. With respect to his financial situation, Father blamed the DCFS for his inability to work, claiming that he was busy trying to comply with his services. On the other hand, Father reported that he had failed to appear for his two most recent drug tests because he was working. Father also admitted that he was no longer participating in his drug treatment program, and indicated that he instead planned to attend Alcoholics Anonymous meetings.

In its supplemental report, the DCFS stated that it had ongoing concerns about the well-being of Bryan and Eduardo in Father's care. The agency noted, however, that the children reported feeling safe in the home and that Jose continued to reside with the children and was protective of them. The DCFS recommended that Bryan and Eduardo be declared dependents of the juvenile court and removed from the custody of Mother, whose whereabouts remained unknown. The DCFS also recommended that the children remain in the home of Father under court supervision, and that Father be ordered to complete a substance abuse treatment program, submit to random drug and alcohol testing, and participate in counseling to address case issues.

### III.    Jurisdiction and Disposition Hearing

The juvenile court held a jurisdiction and disposition hearing on August 25, 2015.[2] The court sustained the first amended petition as alleged and declared Bryan and Eduardo dependents of the court pursuant to section 300, subdivision (b).  On the count alleged against Father, the court found that Father was regularly under the influence of drugs and alcohol and that he was using his money to support his substance abuse rather than to pay the rent.  The court also found that the family often was in the process of being evicted from their home because Father was not providing for the children's care.  On the count alleged against Mother, the court found that Mother had abandoned the children without making a plan for their care.  The court ordered that the children be removed from Mother's custody and placed in the home of Father under court supervision.  The court also ordered family maintenance services for Father, including a substance abuse treatment program, random drug and alcohol testing, parenting education, and individual counseling to address case issues.  On August 27, 2015, Father filed a notice of appeal from the juvenile court's jurisdiction and disposition orders.[3]

## DISCUSSION

On appeal, Father challenges the sufficiency of evidence supporting the juvenile court's jurisdictional finding.  Father specifically contends the evidence was insufficient to support a finding that his drug and alcohol use placed Bryan and Eduardo at a substantial risk of serious physical harm.  As set forth below, we conclude the juvenile court's exercise of jurisdiction over the children was supported by substantial evidence.

---

[2]    Mother did not appear at the hearing and is not a party to this appeal.

[3]    During the pendency of this appeal, this court granted Father's request for judicial notice of a March 21, 2016 minute order entered by the juvenile court.  The minute order reflects that the juvenile court sustained a section 387 petition that was filed on behalf of Bryan and Eduardo on January 19, 2016, and ordered the children removed from the home of Father and placed in the care of the DCFS for suitable placement.

## A.     Standard of Review

We review a juvenile court's jurisdictional findings for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  Substantial evidence is "evidence that is reasonable, credible, and of solid value."  (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1401.)  Under this standard of review, we examine the whole record in a light most favorable to the findings and conclusions of the juvenile court and defer to the juvenile court on issues of credibility of the evidence and witnesses.  (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1103.)  We determine only whether there is any substantial evidence, contradicted or uncontradicted, that supports the juvenile court's order, resolving all conflicts in support of its determination and drawing all reasonable inferences to uphold its ruling.  (*In re John M.* (2012) 212 Cal.App.4th 1117, 1124.)  If there is substantial evidence to support the juvenile court's order, we must uphold the order even if other evidence supports a contrary conclusion.  (*In re N.M.* (2011) 197 Cal.App.4th 159, 168.)

## B.     Mootness

As a preliminary matter, we address the DCFS's argument that the juvenile court's order should be affirmed without addressing the merits of Father's appeal because the jurisdictional finding as to Mother provides a valid uncontested basis for dependency jurisdiction over the children.  It is true that "the juvenile court's jurisdiction may rest on a single ground."  (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127.)  "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.  [Citations.]"  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)  There are circumstances, however, where it may be appropriate to consider the sufficiency of evidence supporting a jurisdictional finding as to one parent, even where a jurisdictional finding as to the other parent is unchallenged

11

on appeal. For instance, in *In re Janet T.* (2001) 93 Cal.App.4th 377, this court reversed a jurisdictional order for lack of sufficient evidence to support the counts in a section 300 petition alleged against the children's mother, despite the fact that the petition included a separate, factually supported count based on a prior abandonment of the children by their absent father. As this court observed, given that the father's unknown whereabouts and failure to provide for the children's needs "was neither the reason for the referral, nor the reason the DCFS filed the petition, . . . [i]t would be anomalous to permit the fact of an absent father to be the sole justification to assert jurisdiction." (*Id.* at p 392.)

Here, Mother's abandonment of Bryan and Eduardo in March 2014 was neither the reason for the family's referral to the DCFS in February 2015, nor the reason the agency filed the original section 300 petition on behalf of the children in June 2015. Rather, the DCFS initiated the dependency proceedings based on allegations that Father was addicted to drugs and alcohol, was exchanging food stamps for beer, and was failing to provide the children with adequate food, housing, and supervision. The allegation concerning Mother's conduct in leaving the children without making a plan for their care was added to the section 300 petition later in the proceedings after the DCFS was unable to ascertain her whereabouts. Additionally, because the jurisdictional finding as to Father could adversely affect him in future dependency proceedings, we conclude his challenge to the sufficiency of evidence supporting that finding is properly before us on appeal.

### C.     Jurisdictional Finding Based On Father's Substance Abuse

In sustaining the petition, the juvenile court found that jurisdiction over Bryan and Eduardo was proper under section 300, subdivision (b) because Father's substance abuse rendered him incapable of providing regular care for the children and placed them at a substantial risk of serious physical harm. Father argues the evidence was insufficient to support the jurisdictional finding because there was no showing that his use of drugs and alcohol posed a substantial risk of harm to his children.

Section 300, subdivision (b) provides, in pertinent part, that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial

risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b).) "The three elements for a section 300, subdivision (b) finding are: '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the [child], or a "substantial risk" of such harm or illness.' [Citation.] The third element . . . effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future. . . . [Citations.]" (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1395-1396.) "Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child [citation]. The court may consider past events in deciding whether a child currently needs the court's protection. [Citation.] A parent's '"[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' [Citations.]" (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383-1384.)

California courts have recognized that a parent's use of drugs or alcohol, standing alone, is insufficient to support dependency jurisdiction under section 300, subdivision (b). (*In re Drake M.* (2012) 211 Cal.App.4th 754, 764 ["the mere usage of drugs by a parent is not a sufficient basis on which dependency jurisdiction can be found"]; *In re James R.* (2009) 176 Cal.App.4th 129, 137 ["[t]he mere possibility of alcohol abuse . . . is insufficient to support a finding [a child is] at risk of harm within the meaning of section 300, subdivision (b)"].) Rather, to support a finding of jurisdiction based on a parent's drug or alcohol use, the DCFS must "present evidence of a specific, nonspeculative and substantial risk to [the child] of serious physical harm." (*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003.) A parent's substance abuse problem can place a child at a substantial risk of harm if it interferes with the parent's ability to provide the child with proper supervision or care. (See, e. g., *In re Kadence P.*, *supra*, 241 Cal.App.4th at

13

pp. 1384-1385 [mother's continuous substance abuse and attempts to conceal it placed young child at substantial risk of harm]; *In re Christian P.* (2012) 208 Cal.App.4th 437, 449-450 [mother's use of methamphetamine and failure to provide children with adequate food and housing presented risk of serious harm to children]; *In re Alexis E., supra,* 171 Cal.App.4th at pp. 451-452 [father's use of marijuana while children were in his care exposed children to marijuana smoke and placed them at risk of physical harm].)

In this case, there was substantial evidence to support the juvenile court's finding that Father had an unresolved substance abuse problem that placed his children at a substantial risk of serious harm. The evidence established that Father had a history of substance abuse and that he continued to use drugs and alcohol during the dependency proceedings. By his own admission, Father used methamphetamine or other illegal drugs an average of twice a week and drank about three beers a day. On the day the DCFS interviewed Father for its jurisdiction/disposition report, Father had already consumed one 40-ounce can of beer that morning and was preparing to drink another a short time later. While Father claimed that he was never under the influence of drugs when the children were in his care, the therapist who visited the family's home to assess the children for mental health services observed that Father appeared to be "coming down from a high" at that time. Additionally, during the course of the proceedings, Father repeatedly tested positive for methamphetamine, amphetamine and marijuana, failed to appear for numerous other drug and alcohol tests, and told the DCFS that he would continue to test positive for drugs because he could not stop using. After some delay, Father eventually enrolled in an outpatient drug treatment program, but was discharged a month later based on multiple positive drug tests and failure to attend his program sessions. Although Father was unemployed at the time the DCFS interviewed him for the jurisdiction hearing, he insisted that his work schedule was the reason for his lack of compliance with his court-ordered services. During the proceedings, Father also failed to show any insight into his substance abuse problem. Rather, he continued to minimize and rationalize his drug and alcohol use, claiming he used methamphetamine solely for work purposes and drank alcohol merely to treat a dry mouth. Indeed, in his interviews

14

with the DCFS, Father maintained that it was necessary for him to use illegal drugs to perform his job and fulfill his day-to-day responsibilities.

The evidence further supported a finding that Father's substance abuse problem interfered with his ability to provide his children with the basic necessities of life. As the juvenile court observed, the family was continually in the process of being evicted from their home due to Father's failure to pay the rent. The family had been able to avoid eviction from their current home solely because the children's 18-year-old brother, Jose, had dropped out of school and started working to pay the rent. In addition to paying the rent on the family's home, Jose made sure that the children always had adequate food. On appeal, Father asserts that his unemployment and lack of financial resources are not a valid basis for dependency jurisdiction. The evidence showed, however, that Father was still capable of assisting with the family's basic living expenses even when unemployed, and that at times, he refused to do so. According to Bryan and Jose, Father previously had agreed to contribute part of the monthly cash benefit that he received in government assistance toward the family's rent; however, he later accused Jose of stealing that money from him and became so angry that he tried to have the police remove Jose from the home. As Jose related to the DCFS, Father "basically . . . wants someone to pay the rent so that he does not have to." Accordingly, while the children reported feeling safe in the family's home and wished to remain there, they also expressed that Jose was the one who took care of them and ensured that their most basic needs were met.

The record also supports the conclusion that Father's drug and alcohol abuse interfered with his ability to provide the children with proper supervision. Jose told the DCFS that he was concerned about the well-being of the children in Father's care, and noted that Father did not pay attention to Bryan's schooling and allowed Eduardo to do whatever he wanted. When the DCFS interviewed the family for the jurisdiction hearing, it was reported that Bryan had a history of marijuana use, he was not currently enrolled in school, and his teenage girlfriend was pregnant. Eduardo appeared to be doing better in a new school after being expelled from his previous one for misbehavior, but his grades continued to be poor. The therapist who evaluated the children for mental health services

15

recommended that services be provided to both Bryan and Eduardo, but she expressed particular concern about Eduardo and reported that the child appeared to be angry.

Father notes that the DCFS found that he was making an effort to meet his parental responsibilities and that, in accordance with the agency's recommendation, the juvenile court allowed the children to remain in his home. However, as our Supreme Court has observed, "[a] dependency adjudication is a preliminary step that allows the juvenile court, within specified limits, to assert supervision over the endangered child's care. But it is merely a first step, and the system includes many subsequent safeguards to ensure that parental rights and authority will be restricted only to the extent necessary for the child's safety and welfare." (*In re Ethan C.* (2012) 54 Cal.4th 610, 617.) Here, the evidence was sufficient to support a finding that Bryan and Eduardo were at a substantial risk of serious harm due to Father's persistent substance abuse, and that jurisdiction over the children was necessary while Father demonstrated sustained compliance with his court-ordered case plan, including participation in random drug and alcohol testing and completion of a drug and alcohol treatment program.[4] The juvenile court's jurisdiction order was therefore supported by substantial evidence.

## DISPOSITION

The juvenile court's jurisdiction finding and disposition order is affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.                    SEGAL, J.

---

[4] At a subsequent hearing, however, the juvenile court found that the children could no longer remain safely in Father's care and ordered their removal from his home.

16